STATE OF MAINE
Washington, ss.

DISTRICT COURT
LOCATION: Calais
DOCKET NO. CV-2012-035

MELANIE STEADMAN

    Plaintiff

v.

STEVEN PAGELS

    Defendant

FINDINGS, CONCLUSION, AND
ORDER

This matter is before the Court for decision, after trial, on the plaintiff Melanie Steadman's claims against the defendant Steven Pagels, Melanie Steadman's father. Her claims are stated in a four count complaint: Count I, sexual assault and battery,[1] Count II, intentional infliction of emotional distress through sexual abuse, Count III, negligent and reckless infliction of emotional distress, and Count IV, punitive damages. The complaint arises out of what the plaintiff alleges were sexual assaults imposed on her by the defendant from when she was approximately age seven to a time after she was age fifteen, plus actions by and contacts with the defendant since that time that have aggravated the harm and damages caused by the defendant's sexual assaults.

---

[1] The pleading of Count I as a sexual assault brings the claim within the unlimited statute of limitations for sexual assaults specified in 14 M.R.S. § 752-C, rather than the two-year statute of limitations for assaults specified in 14 M.R.S. § 753.

Although the case remains pending in the Calais District Court, for the convenience of the parties, the trial was held at the Washington County Courthouse in Machias from September 29 through October 1, 2014.

## Procedural History

The complaint in this action was filed on July 12. 2012. The defendant was served on July 19, 2012. Although the defendant obtained representation of counsel, no responsive pleading was filed by the deadline for filing responsive pleadings. The docket entries reflect that on plaintiff's request, a default was entered on August 9, 2012, one day after expiration of the deadline for filing responsive pleadings specified in M.R. Civ. P. 12(a).

A motion to enlarge the time to file an answer, a late answer, and a request to transfer for jury trial were filed on August 24, 2012. The August 24 answer denied the allegations in the complaint and specifically denied the listed causes of action. It asserted no affirmative defenses.

The defendant, now represented by current counsel, later filed a motion to strike the default, to allow a late filing of an answer and affirmative defenses, and to permit removal to the Superior Court for a jury trial. After a hearing, the Court struck the default and allowed filing of a late answer, specifically the August 24, 2012, answer filed by the defendant's former counsel. The late request for removal to the Superior Court for a jury trial was denied.

Although this Court presided at several pretrial discovery, trial scheduling, and trial management proceedings, and issued orders in those proceedings, the first time that any issue was raised regarding any statute of limitations concern was in closing arguments. After plaintiff's counsel mentioned a statute of limitations issue, defense counsel asserted that the statute of limitations issue had been raised as an affirmative defense, preserving the issue. However, no such affirmative defense was included with the August 24, 2012 answer, the only responsive pleading allowed by the Court as part of its ruling striking the default.

If the statute of limitations issue is not raised in a timely manner, it is waived. *Schindler v. Nilsen*, 2001 ME 58, ¶ 17 n. 7, 770 A.2d 638. Any statute of limitations defense possible in this case was waived by failure to timely plead or otherwise assert it. However, it is doubtful that any timely address of a statute of limitations defense could have limited the claims asserted in this case. By operation of 14 M.R.S. § 752-C, there is no statute of limitations for actions based on sexual acts toward minors, the primary claims at issue in this case. Through most of the 1990s, section 752-C had a twelve-year statute of limitations, but the twelve-year limit was removed by 1999. Thus, the claims at issue in this case, which are based on the defendant's sexual acts towards the plaintiff beginning around 1993, could not be subject to any statute of limitations defense.

The running of any statute of limitations would have been tolled until the plaintiff's eighteenth birthday in March of 2004, 14 M.R.S. § 853. After that date, the statute of limitations, for any claims not subject to 14 M.R.S. § 752-C, would have continued to run for six years, 14 M.R.S. § 752, until March of 2010. The plaintiff was found to be significantly impaired by a mental disability and thus disabled from being gainfully employed and leading a normal life retroactive to sometime in 2009. Thus, pursuant to 14 M.R.S. § 853, the plaintiff's mental illness, diagnosed as early as 2002, further tolled the running of the six-year statute of limitations, to the extent it may have been applicable, up to and after the 2012 filing of this lawsuit.

## Findings of Fact

Based on the testimony of the witnesses at trial, two witness depositions admitted into evidence,[2] and the exhibits that were admitted into evidence,[3] the

---

[2] Although invited by ¶ 3(A) of the Court's Trial Management Order, neither party, at trial, sought exclusion of any portion of plaintiff's two years younger brother's deposition. The Court has considered that deposition as offered.

[3] Based on the Court's detailed review of the exhibits following the trial, the Court's rulings on two exhibits must be amended. First, Plaintiff's Exhibit 13, admitted over the defendant's objection, is only a summary, apparently prepared by counsel, of statements by medical providers that also appear in Plaintiff's Exhibits 6, 9, and 14-19. Plaintiff's Exhibit 13 is not a document that qualifies for admission into evidence pursuant to 16 M.R.S. § 357. Further, Plaintiff's Exhibit 13 includes statements apparently derived from Plaintiff's Exhibit 6, an exhibit that was excluded upon the defendant's objection. At this point, the defendant's objection to Plaintiff's Exhibit 13 is sustained. Plaintiff's Exhibit 13 is excluded from consideration. Second, Defendant's Exhibit 1, admitted over the plaintiff's objection, includes, at Tab 106, a copy of a letter that was offered as Plaintiff's Exhibit 2. The Court sustained the defendant's objection to Plaintiff's Exhibit 2. Based on that ruling, the Court will not consider the letter at Tab 106 of Defendant's Exhibit 1 in reaching its decision.

Court makes the following findings. Except where otherwise indicated, the findings are made by a preponderance of the evidence.

1. At all times relevant to these proceedings, the defendant has owned and operated several charter boats providing windjammer cruises and some sport fishing opportunities primarily serving tourists, including cruise ship passengers, in Bar Harbor, Southwest Harbor, and Eastport. He has also been involved in some marine-related commercial activities in Florida where he has overseen the building of one or more of his boats.

2. The defendant has lived most of the time in a residence in Cherryfield and has maintained an office or offices in and around Cherryfield.

3. The defendant married the plaintiff's mother in the mid-1980's. It was the second marriage for each. At the time of the marriage, Steven Pagels had a son who is approximately five years older than the plaintiff. The son resided primarily with Steven Pagels's former wife, though on some occasions he resided with Steven Pagels's family in Cherryfield.

4. The plaintiff's mother had a daughter from her prior marriage. Her daughter is approximately seven years older than the plaintiff. The daughter resided primarily with her mother and the rest of the Pagels family in the residence in Cherryfield from when she was ten years old until she entered college at age 18.

5. By the time the plaintiff was eight or nine years old, and perhaps earlier, the testimony indicates that the plaintiff's mother had employment as a municipal manager and as a grant writer that caused her to be away from home, including overnights and some weekends, on a fairly regular basis.

6. The plaintiff was born in 1986. She has one brother who is two years younger than she is and another brother who is five years younger than she is.

7. When the plaintiff was approximately seven or eight years old, the defendant would take the plaintiff for rides, alone, in his truck. While driving, the defendant would have the plaintiff sit next to him on the truck's bench seat and, on numerous occasions, would rub his hands between the plaintiff's legs and over the area of her breasts, over her clothing.

8. In approximately the same time period, the defendant was also initiating inappropriate physical contacts with his stepdaughter, seven years older than the plaintiff. On one of those occasions, although other beds were available, the defendant made the stepdaughter sleep next to him on a single mattress on one of his charter boats. She awoke with the defendant's hand under her shirt and bra and on her breast.

9. Following this incident, the stepdaughter refused to work on the defendant's boat. When her mother demanded to know why the stepdaughter was upset and refusing to work with the defendant, the stepdaughter, after resisting,

reluctantly reported the incident, in writing, to her mother. The defendant then apologized to her, saying it was an accident, but there was no further consequence.

10. On several subsequent occasions, when the stepdaughter was between fourteen or eighteen years old, on charter boats when the defendant was alone with the stepdaughter, the defendant would climb on top of the stepdaughter and engage in "humping" actions. During those actions, the stepdaughter was aware that the defendant had an erection.

11. Also on five or six occasions in this time period the defendant would try to rub the stepdaughter's back, placing his hand under her shirt and bra. The stepdaughter would move out of the room to end these encounters.

12. The stepdaughter did not report these encounters to her mother or the plaintiff, though after she entered college, she did tell the defendant that she hated him for his actions.

13. The sexual or sexualized contacts with the stepdaughter ended when she entered college in the Fall of 1997. The most serious sexual assaults on the plaintiff began shortly thereafter.

14. By the time the plaintiff was ten and eleven years old, the defendant was regularly creating circumstances where the plaintiff was alone with him, in his truck, in his office, or in a cabin on one of his boats. Sometimes the defendant would drive the plaintiff to an isolated point on the shore and then either walk with

her or sit on a rock with his arm around her, more like boyfriend and girlfriend than father and daughter. He would tell her that she was "his special little girl."

15. During the time when plaintiff was ten and eleven years old, the defendant would regularly ask the plaintiff to give him what he characterized as backrubs or massages, but which became mutual touching under clothing or with clothing removed, the defendant touching the plaintiff's genitals and breast area, and the plaintiff touching the defendant's genitals and masturbating him as he directed.

16. Early in these encounters, the plaintiff had no context to recognize that this conduct by the defendant was seriously wrong and inappropriate, and that context was reinforced by the defendant admonishing the plaintiff that she should not tell anyone else about these activities, as telling could result in her mother being jealous and in losing contact with her father. As she got older, the plaintiff realized that this conduct, along with severe physical discipline she was facing in her home to support her following her father's direction, was inappropriate.

17. At trial, a babysitter from around this time reported that the plaintiff, more than her brothers, was engaging in acting out and attention-getting behaviors, behaviors that can be consistent with actions of a person who is a victim of abuse in the household. The babysitter also reported that she had been directed by the defendant to particularly focus on and report to him actions by the plaintiff,

because he viewed the plaintiff as a bigger discipline problem in the household than the others residing in the household.

18. In the winter of 1997-1998, the defendant had spent a considerable amount of time in Florida overseeing the construction of a new windjammer sailboat for his charter boat operations. During the time in Florida, the defendant and other crewmembers lived in a large house, with many bedrooms, in St. Augustine.

19. The boat, named the *Margaret Todd*, was scheduled to be launched in May of 1998. The defendant arranged for the plaintiff, then twelve years old, to travel by air, alone, to Florida for the purpose of christening the *Margaret Todd*.

20. The day before the scheduled christening, the plaintiff flew to St. Augustine (or Jacksonville) where she was met by one of the defendant's crewmembers. She was then transported to the house in St. Augustine. At some point during that day, the plaintiff's foot was injured when it was driven over by a crewmember's car. Accordingly, she was in significant pain late in the day and into the evening. The record does not indicate whether the plaintiff received any medical treatment for this injury.

21. At some point later in the day, the defendant arrived back at the house in St. Augustine. After supper, the defendant indicated to the plaintiff that they should prepare to go to bed. Although there were several bedrooms in the house

where the defendant or the plaintiff could have slept alone, and although the plaintiff was in pain from the foot injury she had received earlier in the day, the defendant directed that the plaintiff and he would sleep on a single mattress in his bedroom.

22. Once in his bedroom, the defendant directed that the plaintiff should give him a massage or backrub, which by now the plaintiff recognized as code words for sexual touching. The plaintiff resisted that request. However, the defendant removed the plaintiff's underwear, restrained the plaintiff face down, forced himself on her, and had intercourse with her. The plaintiff cried out several times during this attack, but with no response from others in the household.

23. The next morning, when other members of the crew asked why the plaintiff had been crying out, the defendant reported that she had been crying because of her foot injury.

24. The next day, the plaintiff participated in the christening of the *Margaret Todd*. The defendant suggests, referencing pictures of that event and otherwise, that the plaintiff's participation in that event, without appearing hostile to the defendant, suggests that her claim to have been raped by him the previous evening is a fabrication. However, considering the defendant's conduct to which the plaintiff had become accustomed, and the context of the events, with the plaintiff not having anywhere else to turn, the evidence of her conduct at the

christening is not surprising and does not cause the Court to question the credibility of her testimony that she had been raped the evening before.

25. After staying three nights in Florida, the plaintiff returned to Maine alone.

26. Over the next three years, on occasions when the defendant was alone with the plaintiff, either at the home when no one else was present, or at his office, or on one of his boats, he restrained the plaintiff and forced her to endure sexual intercourse and other sex acts on numerous occasions. Usually these rapes were committed with the plaintiff lying face down or facing away from the defendant.

27. As the rapes continued, the plaintiff began having severe problems sleeping, sometimes being unable to sleep for days at a time. She also began self-destructive behaviors, including cutting herself on several occasions. The plaintiff still bears the scars from such activities.

28. On one occasion in the summer of 2001, the plaintiff's mother arrived at the defendant's office to find the plaintiff sitting on the defendant's lap. At the time, the plaintiff's mother stated to the plaintiff and the defendant that such action was inappropriate, should cease, and should not be repeated. However, the sexual attacks by the defendant continued on occasions when the plaintiff and the defendant were alone, and particularly when the defendant was aware that his wife, the plaintiff's mother, would be away overnight or for a weekend.

29. On one day in late August or early September of 2001, the plaintiff's mother was away. The plaintiff and her two younger brothers were at the home in Cherryfield. The defendant arrived home at about 10:00 p.m. from his charter boat work on Mount Desert Island. At some point later in the evening, the plaintiff and her younger brothers were each in their own room on the second floor of the home. The defendant entered the plaintiff's room and told her that he wanted her to accompany him to his bedroom on the third floor to give him a massage. The plaintiff refused. The defendant then picked the plaintiff up and carried her from her room up the stairs to his bedroom. As the defendant carried the plaintiff, the plaintiff resisted trying to grab items such as doors or moldings to prevent her being carried.

30. Once in the defendant's bedroom, the plaintiff and the defendant argued loudly. At one point, the younger of the plaintiff's brothers called up the stairs and asked if anything was wrong. Because the plaintiff did not want her brothers to know what her father was doing to her and was concerned that the younger brother might be subjected to the defendant's harsh physical discipline if he got involved, she yelled to him that he should stay out of it and stay downstairs. The younger brother then apparently returned to his room, perhaps believing that the loud interchange between the plaintiff and the defendant was just another instance of the defendant's severe physical discipline being imposed on the plaintiff.

31. The defendant then tried to force himself on the plaintiff. After the plaintiff shifted her knees to resist the defendant, the defendant tied her spread-eagled and face down on the bed and had intercourse with her from behind.

32. Shortly after this rape, the plaintiff told her mother that the defendant had been making her give him massages and backrubs, contrary to her mother's directions in the summer. The plaintiff did not tell her mother the full scope of the forced rapes and sexual assaults the defendant had been imposing on her.

33. After talking with her daughter, the plaintiff's mother sought and received a protection from abuse order. That order required the defendant to vacate the home in Cherryfield and have no contact with the plaintiff.

34. At about this time, the plaintiff disclosed to a friend and fellow student at Narraguagus High School information about her father's sexual attacks upon her. While the plaintiff had expected that the information disclosed would be kept in confidence, word about her father's sexual attacks upon her soon became widely known at the school. As a result, the plaintiff was teased, criticized, and ultimately ostracized, becoming known as "the girl who f---s her father."

35. During this time period and later, other family members were critical of the plaintiff for her reporting of the defendant's actions that had led to the family separation in 2001.

36. Her relationships with her fellow students, her grades, and her sense of self-worth all having been destroyed, the plaintiff withdrew from Narraguagus High School and moved, with her mother, to Gouldsboro. There she enrolled in Sumner High School. During this time, plaintiff, usually accompanied by her mother, began seeing counselors to address various mental and physical health issues that began manifesting themselves more seriously after her report of her father's inappropriate contacts.

37. When the plaintiff and her mother moved from Cherryfield to Gouldsboro, the defendant moved back into the Cherryfield home, and the plaintiff's younger brothers remained in the Cherryfield home with their father.

38. After a relatively short time in Gouldsboro, the plaintiff and her mother moved to a home in Calais, the community where her mother worked. During this time, the plaintiff's mother had divorced the defendant. The plaintiff enrolled in Calais High School, initially in the regular high school program, but she later transferred to the alternative program, because she could not function in the regular high school setting.

39. The plaintiff also began abusing drugs, becoming addicted to hard drugs, and she entered into a series of what she estimates to be twenty relationships with "abusive partners."

40. Initially unbeknownst to the plaintiff, her mother resumed her relationship with the defendant, often spending time with him in the Cherryfield home; leaving the plaintiff alone in the Calais home with her addictions and her bad influence friends and acquaintances.

41. The plaintiff was later told that her mother was having "date nights" with her father and, by late 2002, the plaintiff was being forced to attend some of these "date night" family events and be in the presence of her father.

42. Without telling the plaintiff, the plaintiff's mother and father remarried at a ceremony attended by the plaintiff's brothers and some other family members.

43. Over the next five or six years, the plaintiff was regularly required to attend and participate in family events where the defendant was present, with the events documented in pictures offered at trial by the defendant.

The defendant points to plaintiff's participation in these family activities as indicators that the plaintiff is fabricating her claims. Otherwise, it is argued, the plaintiff would have refused to participate in events with her father. However, the plaintiff appears to have had little choice about this participation, the alternative being to be left alone in the house in Calais. The damages evidence indicates that her forced participation at family events attended by her father aggravated the plaintiff's stress, depression, and other mental health problems brought on by the defendant's sexual assaults.

It also must be noted that victims of domestic sexual and physical abuse often continue to seek acceptance from their abuser, posing challenges to domestic abuse prosecutions and often resulting in the very delayed revelations of abuse that have necessitated the extended statutes of limitations for criminal and civil actions against abusers.

44. During the time in Calais, the plaintiff's drug addictions and bad selections of partners increased, and she became increasingly estranged even from her mother who no longer provided either material or emotional support, often leaving the plaintiff alone in the Calais home with some money to buy food. The plaintiff often spent that money on drugs and other things.

45. Beginning in late 2001 or 2002, the plaintiff engaged with a number of counselors seeking to address her mental health and addiction issues. Usually the plaintiff's mother attended counseling sessions.

46. By February 2002, a counselor observed "Impression: PTSD and fear of repeat sexual offense." This supports plaintiff's position that her damages and mental health conditions were caused by events that occurred before that time, not by subsequent traumatic events as suggested by the defendant.

47. An August 2002 report states a post-traumatic stress disorder (PTSD) diagnosis and reports that the plaintiff "did not want to divulge details, but was attacked sexually by someone known to her 8/01."

48. By 2003, the plaintiff was disclosing not only backrubs, massages, and aggressive discipline at the hands of the father, but also some sexual assaults, though her full disclosure of the extent of her father's sexual assaults upon her took many years.

49. By 2003, based on the history she had given, which included some sexual assaults and other observations of her behavior, another counselor offered an initial diagnosis of PSTD.

50. During this time, the plaintiff also became involved with the juvenile justice system and then the adult justice system for drug-related or drug abuse caused offenses.

51. Ultimately, the plaintiff was able to graduate from the alternate school program in Calais and then attempted to begin college courses. Because her mother was apparently either unwilling or unable to provide assistance to purchase books for the plaintiff's college courses, the plaintiff asked her father for help. The defendant indicated that he would help provide support for her purchases of books. He conditioned his offer on her willingness to work for him in his charter boat business. The plaintiff reluctantly agreed and began working in the defendant's charter boat business. However, she left after a short time when the defendant caused her to be with him in private areas on boats or in the business and put his

arm around her and made statements that made her very uncomfortable and fearful that the prior history of sexual attacks would be resumed.

52. By 2009 and 2010, the plaintiff had a number of difficult problems. She was significantly addicted to hard drugs. She had a number of mental health problems that caused significant difficulty with her sleeping and with her capacity to organize her thoughts and focus her attention sufficiently to maintain a steady job. She avoided contact with significant groups of people, shopping when stores were less crowded, and seeking jobs, such as after hours stocking shelves at Wal-Mart, that avoided encounters with many people. She continued to enter into harmful relationships with men.

53. She also continued with various counselors and, by 2010, it appears that she was in a methadone treatment program to address her drug dependency.

54. During this time, she also married one of her abusive partners. In 2011, she gave birth to a child. Before going home, the baby spent significant time in the hospital to address the methadone dependency issue resulting from the plaintiff's methadone treatment.

55. After approximately a month in the plaintiff's home, the child was diagnosed with injuries consistent with shaken baby syndrome for which, the medical records suggest, the plaintiff's abusive husband was believed to be responsible. A child protective proceeding was initiated, and the baby was

removed from the plaintiff's home and continues in the Department of Health and Human Services custody.

56. In 2011, perhaps as a result of the initiation of the child protective proceeding, the plaintiff began relationships with new counselors. The counselors addressed the issues generated in the child protective case and also addressed issues generated in the proceedings relating to the plaintiff's application for a Social Security Disability determination. That application process had been initiated in 2009 and 2010, with document preparation assistance from the plaintiff's stepsister.

57. In the new treatment and counseling relationship, the plaintiff disclosed, for the first time, the full extent of the rapes and other sexual abuse committed by her father. She also began to more successfully address her substance abuse issues, though her capacity to function in society remained limited by her mental health issues.

58. In June of 2012, the Social Security Administration determined that the plaintiff was fully disabled. The disabling impairments found were, principally, post-traumatic stress disorder, with, in addition, major depressive disorder, obsessive compulsive disorder, and substance abuse which, by the 2012 finding, was determined to be in remission. The disability findings also indicated that the

plaintiff had what was characterized as "bi-polar syndrome." The findings further noted that "medical improvement is expected with appropriate treatment."

59. The plaintiff's substance abuse problems have remained in remission since 2011.

60. Since the disability determination, the plaintiff has again married, and in 2013, had another child who was residing with her and her husband as of the date of the trial.

### Application of the Facts to the Causes of Action

Based on the above facts and the procedural history of the case, the Court must determine whether the plaintiff's four causes of action, or any of them, are proved, and if so, the damages that may appropriately be awarded.

The defendant contends that the sexual assaults and the physical assaults that the plaintiff testified were committed upon her, sometimes with a wooden paddle, purportedly for disciplinary reasons, never occurred and that a combination of the plaintiff's mental health afflictions and drug abuse is causing her to fabricate these claims with support from a new counselor. However, the defendant's claim of recent fabrication fails.

As noted earlier, experience teaches and the law recognizes that significantly delayed reporting of sexual abuse committed against a minor is not uncommon. Such delayed acknowledgment and reporting is particularly likely in cases of abuse

committed within the family. Thus, the Legislature has found it necessary to remove statute of limitations barriers to enable individuals who were victims of sexual abuse as minors to seek justice many years or decades after the abuse occurred.

Here, there was some relatively contemporaneous, though incomplete, reporting by the plaintiff. The evidence indicates that the plaintiff confided to a friend in 2001 regarding sexual assaults of some nature that then led to her being teased and ostracized at school as "the girl who f---s her father." Further, the counseling records (Plaintiff's Exhibits 9, 15 & 17) indicate that the plaintiff reported sexual assaults "by someone known to her" to a counselor as early as 2002 and 2003, and that those reports led to a post-traumatic stress disorder diagnosis. Evaluating the evidence, the Court finds the plaintiff's descriptions of the sexual assaults committed upon her generally credible, and the Court finds the defendant's denials of any sexual assaults committed on the plaintiff not credible.

The defendant also contends that all or most of the plaintiff's afflictions, her mental health problems, her past substance abuse, her inability to complete post-secondary education or maintain employment, and her alleged recent fabrication of the events that she testified to in this proceeding, are all caused by a mental health condition, bi-polar disorder, and other mental health conditions that would have manifested themselves, regardless of his sexual assaults upon her.

The Court finds to the contrary. The plaintiff's primary mental health condition, causing most of her difficulties, is post-traumatic stress disorder. The cause of that disorder is the years of degradation, sexual assaults and rapes that the plaintiff endured at the hands of the defendant. That degradation and those assaults and rapes destroyed the plaintiff's self-confidence and sense of self-worth. When she cried out during the sexual assaults, her cries were passed off, by those who heard them, as caused by a physical injury or just another incident of abusive, physical discipline practiced upon the plaintiff by the defendant.

And when she ultimately objected to and reported the abuse by the defendant to others, the plaintiff's situation only got worse. Her family was separated. In short order the plaintiff had to leave the family home with her mother, with the defendant returning to the home and her brothers remaining with him and ultimately supporting his allegations that the plaintiff was fabricating her claims.[4] Because of her report, she was mocked and ostracized by her schoolmates, forced to move out of town and to another school district, and ultimately to Calais.

Once in Calais, the plaintiff saw her mother essentially abandon her, returning to her attacker and often being away from the Calais home, leaving a few

---

[4] Experience indicates that other adults and children living in a household often report being unaware of sexual assaults being committed by an adult living in the household against a minor child living in the household. The Court attached little weight to such testimony in this case that was presented by others who lived in the household. The evidence indicates that, except for the last rape, and the rape in Florida, no one else was present in the places where the sexual assaults occurred.

dollars for food and expecting the plaintiff to fend for her herself. Adding insult to this injury, the plaintiff was expected to and did participate in family events and trips with her attacker and even to go to work for her attacker as her only way to pay for books for college.

To ease the pain of the defendant's assaults and horrific treatment by her family, the plaintiff, not surprisingly, turned to escalating drug abuse and addiction, and a series of relationships with men in which she hoped for acceptance and love, but found more of the same degradation and abuse that she had endured at the hands of the defendant. The defendant's sexual assaults and degradation destroyed plaintiff's self-esteem and sense of self-worth. His assaults and degradation caused her drug abuse, her addictions, her bad relationship choices, and her mental conditions that have rendered her unable to work or further her education.

The defense asserts that some of the plaintiff's conditions, injuries, and medical expenses, must necessarily have been caused by multiple automobile accidents in which the plaintiff was involved in recent years, or by assaults by various boyfriends and others, or by other acts not causally related to actions by the defendant. On claims that damages are attributable to other causes and not to a defendant's actions, the burden is on the defendant to demonstrate what damages and/or what costs are attributable to causes other than the actions for which the

defendant is alleged to be liable. *Lovely v. Allstate Insurance Co.*, 658 A.2d 1091 (Me. 1995). The defendant has not maintained his burden of proof to demonstrate that any of the plaintiff's claimed damages are attributable to causes other than the defendant's activities, although the defendant was invited by the Court to do so in reviewing the medical care costs listed in Plaintiff's Exhibit 24 and the medications costs listed in Plaintiff's Exhibit 14.

For damages calculations, the Court determines that all of the plaintiff's conditions and problems discussed above and the plaintiff's self-destructive behaviors that may have aggravated those circumstances and conditions, were caused by the defendant's degradation and sexual assaults upon the plaintiff and his callous treatment of the plaintiff within the family.

Accordingly, the Court determines that the plaintiff has proved, by a preponderance of the evidence, the elements of Count I, alleging sexual assault, and has proved, by a preponderance of the evidence, that the injuries and damages to the plaintiff, discussed above, have been caused by the defendant's sexual assaults and related callous treatment of the plaintiff.

The Court likewise finds, by a preponderance of the evidence, that the plaintiff has proved the elements of Count II, intentional infliction of emotional distress. Specifically, the Court finds that the defendant engaged in conduct, indicated in the above findings, that intentionally caused the plaintiff severe, long

lasting emotional distress, and that the defendant's conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable. The emotional distress suffered by the plaintiff as a result of the defendant's conduct was such that no reasonable person could be expected to endure it without significant damage or loss.

The Court also finds, by a preponderance of the evidence, that the plaintiff has proved the elements of Count III, negligent infliction of emotional distress, based on the findings stated above.

The Court also finds that the plaintiff's damages are attributable to the defendant's actions in intentionally and recklessly causing emotional distress to the plaintiff.

Turning to Count IV, punitive damages, the Court finds, by clear and convincing evidence—and the Court could find to the beyond a reasonable doubt standard if it had to—that the defendant acted with malice in his sexual assaults upon and sexual degradation of the plaintiff. There is no question that the defendant knew that such actions would hurt the plaintiff and that he intended to hurt the plaintiff with such actions. He had already seen the damages and injury caused to his sister and his stepdaughter by his sexual degradations perpetrated on them, and there can be no question that the defendant, who for a time was chair of

the local school board, was aware that his sexual assaults on a minor child would cause injury and would be life damaging if not life destroying.

While no amount of damages can compensate for the destruction that has occurred in the plaintiff's life, and no amount of damages can put her in the position that she would have been in had she been raised in a loving, supportive family, free of sexual assault and degradation, the Court must try to develop a damages award that is reasonable in light of the current, difficult circumstances of the plaintiff.

For damages caused by the defendant as a result of the injuries inflicted as alleged in Counts I, II, and III, the Court finds special damages of (i) $33,594.10 for costs of medical care, consultation and treatment, and costs of medication indicated in Plaintiff's Exhibit 14 and Plaintiff's Exhibit 24; (ii) $45,000 in lost earnings, calculated at the minimum wage level, for the three years that the Social Security Administration has determined that the plaintiff is unable to work because of her disability, before her work capacity should be reviewed; and (iii) $10,000 for costs of future treatment and counseling, from September 1, 2014 to September 1, 2015 that the Social Security Administration findings, and the plaintiff's therapist's testimony, indicate will more likely than not be required (two sessions most weeks) to maintain plaintiff's progress in treatment in the near term with her

current disability status. The plaintiffs special damages, proved to have been caused by the defendant's actions total $88,594.10

As general damages for past, present, and future pain, suffering, mental anguish, and loss of enjoyment of life, the Court finds that the defendant has caused damages to the plaintiff in the amount of $1,300,000. Of this amount, the Court finds that 30 percent is attributable to future pain, suffering, mental anguish, and loss of enjoyment of life. While the plaintiff has a long life expectancy, and the trauma of the defendant's actions will affect her for the rest of her life, the evidence that with support of continuing counseling and treatment, the plaintiff's current impairments will be reduced over time results in the determination that the amount of future losses that can be proved by a preponderance of the evidence is 30 percent of the total of $1,300,000 found above.

The Court finds, based on the findings stated above, the defendant liable for punitive damages in the amount of $500,000. The Court notes that the Court need not make any particular findings with regard to the defendant's finances to award punitive damages. *See Ferrell v. Cox*, 617 A.2d 1003, 1008 (Me. 1992). But in this case, the Court notes that the defendant has real estate, plus a substantial charter boat business with several boats, some of which are worth more than a million dollars each, and many employees supporting his chartering activities.

Therefore, on the plaintiff's complaint, the Court ORDERS:

Judgment for the plaintiff in the amount of $88,594.10 in special damages, $1,300,000 in general damages, and $500,000 in punitive damages, (a total of $1,888,594.10) plus costs and interest, to be recovered from the defendant.

By specific direction of the Court, the Clerk may enter this order by incorporating it by reference into the docket. M.R. Civ. P. 79(a).


Date:  October 14, 2014 _____/S/_____
Donald G. Alexander
Judge, Maine District Court

Judgment for the plaintiff in the amount of $88,594.10 in special damages, $1,300,000 in general damages, and $500,000 in punitive damages, (a total of $1,888,594.10) plus costs and interest, to be recovered from the defendant.

By specific direction of the Court, the Clerk may enter this order by incorporating it by reference into the docket. M.R. Civ. P. 79(a).

Date: October 14, 2014

Donald G. Alexander
Judge, Maine District Court